DORIS ALLEN GRIFFITH (RAKE) v. ROBERT C. GRIFFITH.

(Filed 19 May, 1954.)

**1. Divorce and Alimony § 19—**

In awarding the custody of a minor child in a divorce action, the criterion is the best interest of the child, and all other factors, including the visitorial rights of the other parent and the common law preferential rights of the father, must be deferred or subordinated thereto.

**2. Same—**

If, upon a consideration of all relevant factors, the court determines that the mother is best fitted to give the child the home life, care and supervision that will be most conducive to its well being, the court should award the custody of the child to the mother, and should not hesitate to grant her subsequent application to remove the child to her out-of-state domicile, established upon her remarriage, upon finding that the best interest of the child will be served thereby, notwithstanding that this will preclude or make more difficult visitorial rights of the father, and notwithstanding that the father may be a fit and suitable person to have the custody of the child.

**3. Same: Appeal and Error §§ 40d, 50—**

Where the mother's application to remove the child in her custody from this State to her domicile in another state is denied upon misapprehension that such permission could not be granted except upon a finding that the father is an unsuitable person to have the custody of the child, the finding that the best interest of the child would be served by awarding its custody to the father will be set aside and the cause remanded to the end that the court may consider the evidence and find the facts in the light of correct legal principles.

APPEAL by plaintiff from *Hall, Special Judge,* at 15 March, 1954, Term of GUILFORD (High Point Division).

Motion in the cause to modify judgment in divorce action awarding custody of three-year-old girl.

The plaintiff mother instituted this action for divorce on the ground of two years separation. The defendant did not contest the divorce action, but both parents sought custody of the child, then living with the mother. The cause was heard at the October, 1953, Term of court. There was a jury verdict in favor of the mother in the divorce action. Following this, Judge Sharp, then presiding, heard evidence *pro* and *con* on the question of custody. All the evidence disclosed, and the father conceded, that the mother's character was good in every way and that she was "a fit and suitable person to have the care and custody" of the child. The father's opposition to the mother's continued custody arose out of the probability that she intended to take the child out of the State. He testified she told him she intended to remarry after the divorce and move to Ohio. These further facts were developed at the hearing: The plaintiff and the defendant were married 20 May, 1950. She was then 20 years of age, he 22. The child, Susan Leigh Griffith, was born 18 January, 1951. The parents separated by mutual assent 2 June, 1951. The plaintiff, with the baby, went back to the home of her mother, and the defendant father returned to the home of his parents. Both homes are in High Point. It was necessary for the plaintiff to work. She found employment at the County tax office. Her mother looked after the little girl during the day while plaintiff was at work. After the separation, the plaintiff met and later became engaged to marry Floyd Rake, Jr., a former resident of California, who had recently come to this State in the employ of Cleminshaw Company, of Cleveland, Ohio, specialists in the field of property appraisals, then in process of re-appraising the taxables of Guilford County. Rake testified he had been with this company since being graduated from the University of New Mexico in 1948; that during this time he had served the company on appraisal projects in several states, going from place to place as and when directed by the company; that he was making from $540 to $550 a month; and that he had plans to settle permanently in this State. He

testified that he loved the child and it was his "intention to give the child all the love and affection that a natural father could possibly give her." He further testified, as did the plaintiff mother, that they did not intend to take the child out of the State.

At the conclusion of the hearing, Judge Sharp found that the mother was a fit and suitable person to have custody of the child and that the best interests of the child would be served by awarding custody to the mother. Thereupon judgment was entered decreeing absolute divorce and directing that the child remain in the custody of the mother, subject to specified visitation privileges granted the defendant father, with further direction that "the plaintiff shall not take the child outside of the State of North Carolina."

At the March Term, 1954, the mother moved the court to modify the judgment so as to permit her to take the child outside the State of North Carolina to reside. At the hearing before Judge Hall, the evidence disclosed that the plaintiff and Floyd S. Rake, Jr., were married within ten days after the decree of divorcement in October, 1953; that Rake, with a view of giving up his appraisal work with the Cleminshaw Company, made efforts to secure a job in North Carolina, but could find nothing except at "a considerable decrease in salary"; that about 7 December, 1953, due in part to an accident in which two of the Cleminshaw partners were killed, there was a general shifting of personnel, and Rake was offered re-assignment to New Jersey as State Field Manager at an increased salary. He accepted the offer and immediately went to New Jersey. He has secured an apartment in a desirable section of the town of Passaic, with playroom and playground facilities, and also with a private room for the little girl. The plaintiff joined her husband in New Jersey the first week in January, 1954, leaving the child in High Point with her mother. After that, plaintiff spent two weeks at the apartment in New Jersey and then came back to High Point and remained there through the hearing.

It was further disclosed that since the child was born she has never stayed overnight with her father at the home of his parents. Nevertheless, his mother testified that should the court award custody to her son, she would "be very happy to have" the child and would do all she could for her, and "would assist Bob (the defendant) in taking care of the child." She said she had maid service and worked part-time at the office with her husband and sons, but that she did not have to work and would give it up and stay home with the child if need be. It was conceded that all members of the Griffith family are of good character and that the environment of their home is good. The plaintiff testified on cross-examination that her former husband "is not unfit to have the child," but she further said, "I do think that the health or welfare of the child would

be materially hurt by being in the custody of Bob for a length of time and his mother. . . . when she comes home the times they have had her I don't know whether it is dicipline or what . . . but there is a difference. . . . continuity is what a small child needs." The mother then went on to say that "they (the defendant and his mother) would be good to the child and I think they are fit to have her and it is a fit place for them to have her. I am familiar with the home. Yes, I said it would not hurt if he had part custody and I said at the last hearing that I planned to live somewhere in North Carolina. That is changed."

At the conclusion of the evidence defendant's counsel took the position, and requested the court to so hold, that in view of the admissions on the part of the mother to the effect that the father "is a fit and suitable person and that his home . . . is a fit and suitable place" and that "she is now residing with her husband in the State of New Jersey," the mother, as a matter of law, was no longer entitled to custody of the child.

The agreed case on appeal discloses that thereupon "the court took the position that he could not grant permission for the child to be taken out of the State of North Carolina," but stated "that he would grant the custody of said child to the plaintiff if he had power to do so and asked that briefs be filed on the subject."

The following excerpt from the agreed case on appeal discloses what happened next:

"After considering the briefs and arguments of counsel the court expressed the opinion that under the laws of the State of North Carolina he could not allow said child to go out of the State unless it would be dangerous to the child's welfare for the resident defendant to have custody and further that he could not give custody to the nonresident plaintiff. The court then entered . . . judgment set out in the record."

The judgment recites these essential findings of fact: (1) that the plaintiff is now a resident of the State of New Jersey, residing with her husband, Floyd S. Rake, Jr., who is permanently employed in that state; (2) that "both plaintiff and defendant are fit and proper persons to have custody, control and maintenance" of the child, with each having "a good and suitable home for the child," but that "the plaintiff's home is outside the jurisdiction" of the court; and (3) that "the interests of the child would be served best by granting . . . custody to the father, the defendant, within the State of North Carolina; that conditions have changed since the entering of the order of October 6, 1953."

Upon the foregoing findings judgment was entered awarding custody of the child to the father, subject to the mother's right to visit her at all reasonable times, with specific provision that the mother be permitted to visit with her for two weeks every month, provided all visits be "within

the confines of the State of North Carolina," and that the mother shall not take the child outside the State.

From the judgment entered the plaintiff appealed, assigning errors.

*Haworth, Haworth & Walker, Byron Haworth, and Clifford Frazier, Jr., for plaintiff, appellant.*
*Schoch & Schoch for defendant, appellee.*

JOHNSON, J. The judgment below seems to have been entered by the trial judge under the belief that as a matter of law he could not permit the mother to remove the child from the State in the absence of an affirmative showing that the resident father is unfit for custody. While this view is supported by statements appearing in some of the earlier decisions of this Court, the settled law of this State places no such burden on a parent custodian who requests leave to remove a child from the jurisdiction of the court. In such case we apprehend the true rule to be that the court's primary concern is the furtherance of the welfare and best interests of the child and its placement in the home environment that will be most conducive to the full development of its physical, mental, and moral faculties. All other factors, including visitorial rights of the other applicant, will be deferred or subordinated to these considerations, and if the child's welfare and best interests will be better promoted by granting permission to remove the child from the State, the court should not hesitate to do so. The criterion is not whether the resident parent or applicant does or does not possess the minimum of custodial fitness, but, rather, it is for the court to determine by way of comparisons between the two applicants, upon consideration of all relevant factors, which of the two is best-fitted to give the child the home-life, care, and supervision that will be most conducive to its well-being. Naturally, no hard and fast rule can be laid down for making this determination, but each case must be determined upon its own peculiar facts and circumstances.

The foregoing formula is in accord with the decisions of this Court in *In re Means,* 176 N.C. 307, 97 S.E. 39, and *Clegg v. Clegg,* 187 N.C. 730, 122 S.E. 756, and is supported by the overwhelming weight of authority in this country, as shown by the collection of cases in these Annotations: 154 A.L.R. 552, and 15 A.L.R. 2d 432. See also *Harris v. Harris,* 115 N.C. 587, 20 S.E. 187.

The courts are being called upon more and more to decide these non-residence child-custody cases. The cause stems from the frequency with which divorced parents remarry and, as a natural incident to our ever-expanding interstate economy, move from place to place across state lines. The practical aspects of the forces at play are succinctly stated in the annotation in 154 A.L.R. at page 552:

"Frequently one of the divorced parents marries a nonresident; often a parent is employed by, or marries one who is employed by, a corporation which transfers him to another jurisdiction; at other times one obtains a position or business in another jurisdiction; at times it becomes necessary for the parent having custody of a child to live with relatives in another jurisdiction for economic reasons; and occasionally one parent moves to a second state while the other parent moves to a third state. In these and other instances the question arises whether the person having custody of a child or to whom custody would otherwise be granted is to be tied down permanently to the state which awards custody. The result of the decisions is that where the custodian has a good reason for living in another state and such course is consistent with the welfare of the child, the court will permit such removal or grant custody to the nonresident; but where such course is not consistent with the child's best interests, its removal will not be permitted, and the courts will not award custody to a nonresident."

The following are representative cases, selected from the mass of citations appearing in the foregoing annotations, in which courts of last resort have sanctioned child-custody awards to nonresidents, or approved removal of the child to another jurisdiction in which the custodian had established or intended to establish a new residence, where it was made to appear that such removal would better promote the welfare and interests of the child: *Worthy v. Worthy,* 245 Ala. 54, 18 So. 2d 721; *Roosma v. Moots,* 62 Idaho 450, 112 P. 2d 1000; *Duncan v. Duncan,* 293 Ky. 762, 170 S.W. 2d 22, 154 A.L.R. 549; *Lambeth v. Lambeth,* 305 Ky. 189, 202 S.W. 2d 436; *Welker v. Welker,* 325 Mass. 738, 92 N.E. 2d 373; *Campbell v. Campbell,* 156 Neb. 155, 55 N.W. 2d 347; *Butler v. Butler,* 83 N.H. 413, 143 A. 471; *Nash v. Nash,* 236 App. Div. 89, 258 N.Y.S. 313, affd. without op. 261 N.Y. 579, 185 N.E. 746; *Arnold v. Arnold,* 67 Ohio App. 282, 36 N.E. 2d 430; *Watkins v. Rose,* 115 S.C. 370, 105 S.E. 738; *West v. West,* 208 S.C. 1, 36 S.E. 2d 856; *Kirby v. Kirby,* 126 Wash. 530, 219 P. 27; *Bennett v. Bennett,* 228 Wis. 401, 280 N.W. 363.

In *Arnold v. Arnold, supra* (36 N.E. 2d 430), wherein it was made to appear that the divorced mother, to whom custody of the child had been awarded in her Ohio divorce action, had secured more remunerative employment in Florida, and that the welfare of the child would be best served by permitting it to live with the mother in Florida, it was held that such circumstances warranted modification of the former order so as to permit the mother to take the child to Florida.

In *Kirby v. Kirby, supra* (219 P. 27), wherein it appeared the child's mother had remarried and her second husband could improve his business connections and associations by removing from the state, it was held that

the beneficial effect which such better business connections would have upon the welfare of the child justified its removal from the jurisdiction.

In *Bennett v. Bennett, supra* (280 N.W. 363), wherein the father, to whom custody of the child had been granted in a divorce proceeding, had an opportunity for employment in another jurisdiction at a larger salary and with prospect of advancement, and it appeared that the welfare of the child would not be impaired in any way by the removal, an order authorizing removal of the child from the jurisdiction was held proper.

In *Campbell v. Campbell, supra* (55 N.W. 2d 347), the Nebraska divorce decree awarded custody of a twenty-eight months old boy to the mother. Eight months later the mother filed application requesting permission of the court to remove the child to another state, the basis of the application being economic necessity of the mother. The trial court entered a decree denying the application and awarding custody of the child to his father's parents and enjoining his removal from the jurisdiction of the court. On appeal the judgment was reversed, with the Court stating: "We find no reason whatever for depriving plaintiff of the child's custody or preventing his removal from the jurisdiction of the court to Idaho where apparently his best interests will be served."

Numerous well-considered decisions give emphasis to the proposition that when it is apparent the best interests of the child will be promoted by permitting removal from the state, the court should not hesitate to grant leave of removal by reason of the fact that the visitorial or part-time custodial rights of the other parent would be curtailed or eliminated thereby; *Roosma v. Moots, supra; Duncan v. Duncan, supra; Lambeth v. Lambeth, supra; Kane v. Kane,* 241 Mich. 96, 216 N.W. 437; *Butler v. Butler, supra; Nash v. Nash, supra; Arnold v. Arnold, supra; Bennett v. Bennett, supra.*

In *Duncan v. Duncan, supra* (170 S.W. 2d 22), it is stated: "The sole question presented by this appeal is whether the chancellor erred in modifying the judgment so as to permit Mrs. Duncan to remove to Pennsylvania and take the children with her. The only objection to the modification is that it will make the visitations of the father more difficult, but his convenience must give way to what is for the best interests of the children."

In *Lambeth v. Lambeth, supra* (202 S.W. 2d 436), wherein it was made to appear that it would be for the best interests of an infant girl to go with her divorced mother from Kentucky to the State of Mississippi to live with her close relatives, the mother was given custody notwithstanding the father would be deprived of week-end custody granted him in the former order.

In *Butler v. Butler, supra* (143 A. 471), wherein the trial court in New Hampshire awarded custody of five children to a custodian living

in Massachusetts, the appellate court, in affirming the judgment below, said : "While access to the child by the parent denied custody is an important right, it is one that must yield to the greatest good of the child."

In *Kane v. Kane, supra* (216 N.W. 437), it is said: "Access to the child by the parent denied custody is an important right. It is recognized that awarding custody to a nonresident parent may render the privilege of visitation impracticable in many cases. That privilege is not an absolute right, but one which must yield to the good of the child."

The former decisions of this Court cited and relied on by the defendant have been examined and carefully considered. They are distinguishable or not authoritative and controlling upon the facts here presented.

The defendant urges that, in the absence of a showing of unfitness on his part, he is entitled to custody of the child as a matter of law upon the authority of the following statement in *Latham v. Ellis,* 116 N.C. 30, 33, 20 S.E. 1012: "In North Carolina the father has always been entitled to the custody of his children against the claims of every one except those to whom he may have committed their custody and tuition by deed (Sec. 1562 of *The Code*); *or unless he is found to be unfitted to keep their charge and custody by reason of his brutal treatment of them, or his reckless neglect of their welfare and interests,* when their care will be committed to some proper person on application to the courts." (Italics added.) However, when the entire opinion in the cited case is read and considered contextually in the light of its factual background, it is apparent that the foregoing excerpts may well be treated as *obiter dicta* and disregarded as being at variance with the established rule that the welfare of the child is the paramount consideration to which all other factors, including common law preferential rights of the parents, must be deferred or subordinated, in accordance with principles enunciated in the oft-cited decision in *In re Lewis,* 88 N.C. 31 (decided more than ten years before *Latham v. Lewis, supra*), in which *Ruffin,* the younger, said : "As touching the right to the custody of children, the doctrines of the *common law* have been greatly weakened of late, and courts pay less regard to the strict legal rights of parents, even than they were wont to do, and look more to the interests, moral and physical, of the infants themselves— making it, indeed, their paramount consideration." And then, on authority of Hurd on *Habeas Corpus,* 528, the opinion goes on to say : ". . . where the custody of children is the subject of controversy, the legal rights of parents and guardians will be respected by the courts, as being founded in nature and wisdom, and essential to the virtue and happiness of society, still the welfare of the infants themselves is the polar star by which the discretion of the courts is to be guided; . . ." See also *Finley v. Sapp,* 238 N.C. 114, 76 S.E. 2d 350; *Brake v. Brake,* 228 N.C. 609, 46 S.E. 2d 643.

It is also noted that in *Latham v. Ellis, supra,* neither of the applicants was a nonresident.   There, the custody of a 6-year-old girl was involved, in a contest between the child's father and her maternal grandparents, in whose home the little girl's father had lived with her and her older brother for about four years following the death of the children's mother, which occurred only ten days after the girl's birth.   The father—shown to be a moral, temperate, and industrious man, possessed of a kind, affectionate nature, and fit and suitable to have custody of the child—remarried and moved away, taking with him the little boy two years older than the girl, and established a home several miles distant.   The home so established was shown to be a suitable and proper place in which to rear the little girl.   The lower court awarded custody to the father, and this Court affirmed, with the record on appeal disclosing conclusively that the well-being of the child would be best promoted by allowing her to be reared with her young brother in the home of her father, rather than requiring her to remain in the lonely home of her aged grandparents, notwithstanding they were shown to be "persons of good character," with affectionate attachment to the little girl and possessed of sufficient means to care for all her physical needs.   It thus appears that the decision in the cited case may well have been rested on paramount considerations of the child's welfare and sustained on authority of the principles explained and applied in *In re Lewis, supra* (88 N.C. 31), rather than upon the preferential rights of the father under outmoded principles of the ancient common law.

Therefore, since the correct result was reached in *Latham v. Ellis, supra,* we do not overrule the decision.   Instead, we disapprove the statement of principles upon which the decision was rested and treat such statement as *obiter dicta,* not to be followed or considered as authoritative, either in respect to the *Latham case* itself or any subsequent decision based on the disapproved statement of principles appearing therein.   (See *In re Fain,* 172 N.C. 790, 90 S.E. 928, and other cases citing the *Latham case* shown in Shepard's North Carolina Citations.)

The defendant cites a number of decisions in which this Court (1) approved rulings below in declining to award custody to nonresident applicants or (2) disapproved rulings *contra.*   (*In re Turner,* 151 N.C. 474, 66 S.E. 431; *Walker v. Walker,* 224 N.C. 751, 32 S.E. 2d 318; *In re De Ford,* 226 N.C. 189, 37 S.E. 2d 516; *Gafford v. Phelps,* 235 N.C. 218, 69 S.E. 2d 313).   However, our examination of these cases discloses that the essence of the decisions is not that nonresidence is in itself a disqualification for custody, but rather that the child's welfare and interests would be better subserved and promoted with custody awarded to the applicant who perchance was a resident of this State.   And it is noted that in *Harris v. Harris, supra* (115 N.C. 587), also cited by the defendant, the crucial factor is the failure of the nonresident applicant to carry the burden of

proof by showing she was in anywise more suitable than the resident parent. See Annotation: 15 A.L.R. 2d 432, at page 463.

Also, it is an established rule with us that in the absence of unusual circumstances the courts should not enter an order permitting a child to be removed from the State by one to whom unqualified custody has not been awarded. The reason for this rule rests on practical considerations of procedure as explained by *Barnhill, J.,* now *C. J.,* in *In re De Ford, supra* (226 N.C. 189). However, it is implicit in this rule that its application does not in anywise interfere with the operation of the principle which sanctions award of absolute custody to a nonresident applicant, with or without the right of visitation, when such is shown to be conducive to the best interests and welfare of the child. Where this is made to appear and an award is made in favor of a nonresident applicant against a resident parent of the child, we proceed upon the assumption that courts, properly established and having jurisdiction at the domicile of the nonresident custodian, may hear further and determine justly matters touching the care and control of the child upon such changed conditions, made to appear, as would require modification of the custodial status. *In re Means, supra* (176 N.C. 307); 17 Am. Jur., Divorce and Separation, Sec. 668; 39 Am. Jur., Parent and Child, Sec. 25. See also *Hardee v. Mitchell,* 230 N.C. 40, 51 S.E. 2d 884; *Story v. Story,* 221 N.C. 114, 19 S.E. 2d 136; *Stout v. Pate,* 209 Ga. 786, 75 S.E. 2d 748.

We have not overlooked the fact that the judgment below contains a recital in the nature of a finding to the effect that the interests of the child would be served best by granting custody to the defendant father. Nevertheless, the record impels the conclusions that the case was heard and judgment was entered under a misapprehension of the pertinent principles of law. With us, the usual practice is to set aside facts which are found under misapprehension of the law, on the theory that the evidence should be considered in its true legal light. *McGill v. Lumberton,* 215 N.C. 752, 3 S.E. 2d 324, and cases there cited. See also *Coley v. Dalrymple,* 225 N.C. 67, 33 S.E. 2d 477; *Credit Co. v. Saunders,* 235 N.C. 369, top p. 373, 70 S.E. 2d 176, bot. p. 179. It is so ordered here. Therefore, to the end that the plaintiff may have the evidence considered and the facts found in the light of correct legal principles, the judgment is reversed and the cause remanded.

Reversed and remanded.