H————————, Plaintiff-Respondent,

v.

D————————, Defendant-Appellant.

No. 8209.

Springfield Court of Appeals.

Missouri.

Dec. 6, 1963.

Motion for Rehearing or for Transfer to Supreme Court Denied Jan. 2, 1964.

Thomas Strong, Farrington & Curtis, Springfield, for defendant-appellant.

John F. Carr, Miller, Fairman, Sanford, Carr & Lowther, Springfield, for plaintiff-respondent.

HOGAN, Judge.

This is a child custody action. The plaintiff is the father of the child, and the defendant is her mother. They were married on January 25, 1957, and the child was born November 6, 1958. The two were separated shortly after the child was born. They were divorced in the Circuit Court of Greene County, Missouri, on May 1, 1959, and at that time the trial court granted a divorce to the plaintiff, but awarded custody of the child to the defendant. In January 1962, the plaintiff filed this Motion, requesting modification of the original decree so as to grant him the care and custody of the child, and asking for permission to remove the child to California, where he now resides. As grounds for his Motion, the plaintiff set up that: (a) the defendant was unfit to have custody of the child; (b) the defendant had, in effect, relinquished her right to care and custody of the child by placing her in the home of the maternal grandparents in Missouri, while defendant removed her residence to California; (c) the defendant had been engaged in an illicit relationship with a man not her husband; and (d) the plaintiff had been denied access to the minor child, without cause. The defendant filed a responsive pleading in which she traversed the allegations of the plaintiff's Motion generally, prayed that she be allowed to take the child to California, and asked that the amount provided for child support be increased. The trial chancellor has modified his original decree by awarding custody of the child to the plaintiff and granting permission to remove the child to California. The defendant has appealed.

Though the evidence is irreconcilably in conflict on almost every point, it is fair to say that the parties have had only a brief and very troubled marital career. The two were married in 1957 when the plaintiff was about 20 and the defendant only about 18. Their acquaintance was very limited when they were married, and their difficulties were not long developing. The

plaintiff began drinking heavily within a short time and, at least according to the defendant's testimony, was physically abusive to her on a number of occasions. She estimated that the two were separated "as many as three times" during their first year of marriage.

In February 1958, the defendant began a proceeding for divorce and moved to St. Louis to live with her sister, only to discover that she was pregnant. According to the defendant, she then "talked to his parents" about "financial help with the baby" and, according to the plaintiff, he went to St. Louis and "brought her back." In any event, the two were temporarily reconciled and the minor child was born November 6, 1958. Whatever the basic source of trouble between the two, this attempt at reconciliation was unsuccessful. In December 1958—according to the defendant because of the plaintiff's physical abuse—the parties were finally separated, and on May 1, 1959, they were divorced.

During the period from early December 1958 to March 1960, when the plaintiff moved to California, there seems to have been little contact between the two. The defendant's evidence indicated that the plaintiff made very little effort to see the child and that when he did attempt to see her he was sometimes intoxicated and only came "to torment me." The plaintiff very positively denied that he was abusive either to the child or to his wife during this period; he maintained that he had visited the child as often as possible, and had provided as much support as his means allowed. In March 1960, the plaintiff moved to California, while the defendant remained in Springfield. Several witnesses testified to the defendant's exemplary behavior during this period following the divorce and preceding her ill-fated attempt to become reconciled with the plaintiff in 1961. It is not seriously contended that during the first two years of her child's life the defendant conducted herself with any impropriety, nor that she failed to care properly for her child. The evidence indicates that the de-

fendant at this time led a quiet and conventional life as a stenographer for a local drug firm, and that she spent as much of her time as possible caring for her child; the record indicates that she was a devoted and attentive mother. Indeed, we may summarize the whole diffuse record concerning the four years between January 1957 and January 1961 by saying that the evidence shows principally that the whole married career of these unfortunate litigants was characterized by misunderstanding, frequent quarrels which often ended in physical violence, and numerous periods of separation and attempted reconciliation. The relationship between the parties, both during their marriage and after their divorce in 1959, was often marked by an atmosphere of mutual suspicion or downright hostility and, while the record does not convincingly show the real source of their difficulty, it does show that their feelings toward each other had not abated at the time this case was tried. For this reason, we are frank to say that we accept the parties' testimony —at least that concerning the other's behavior—with considerable reserve.

The principal matter litigated upon this trial was the series of events which occurred after January 1961 when the plaintiff and defendant again attempted to become reconciled. As we have said, the plaintiff had moved to California in March 1960, seeking employment. Early in 1961, the plaintiff visited Springfield and while here he called on the defendant. Whatever his motivation at the time, plaintiff asked the defendant to return to him and bring the child so he might "establish a home for her and the child and be remarried to her." The circumstances surrounding this undertaking initially are not questioned: the plaintiff admittedly requested that the defendant return and promised the defendant that he would marry her immediately if she would do so. In February 1961, the defendant took the child and went to California where she joined the plaintiff.

The parties were not remarried. According to the plaintiff, the defendant never

actually mentioned marriage, either at the time of his proposal that she return with him to California or after she joined him. When he broached the subject of marriage, he was told by the defendant "that she did not care for me, and did not want to marry me" and that defendant had joined him only "to provide welfare for her [defendant] for a certain length of time, until she could become established." The defendant, on the other hand, maintained that she had consented to go to California only in reliance upon plaintiff's offer of marriage, and that when she arrived plaintiff refused to marry her. When he was pressed, the defendant testified, the plaintiff would temporize, stating that the two would be married "within a few weeks" or "as soon as we can get a baby sitter." In any event, the two resumed cohabitation, established a home together with the child, and held themselves out to their acquaintances as being husband and wife. Eventually the defendant secured employment and the two shared their earnings and established a joint bank account. This arrangement lasted until the end of June or beginning of July, 1961. Both parties (then in their early twenties) assured the trial court that though they shared the same roof they voluntarily remained continent after the first few weeks in California.

In describing the plaintiff's actions during this period from February to July 1961, the defendant vividly accused the plaintiff of very serious improprieties toward the child. It was the defendant's testimony that the plaintiff disciplined the child harshly and unnecessarily. She testified that the plaintiff exposed his genital organs to the child in an obscene manner: it was her position that he did so deliberately in order to frighten the child, and she said that for this reason "I was so mad and so hurt and I left the following week end." The plaintiff vigorously denied that any such incident ever occurred. His explanation—if it can be called that—for the parties' final separation in July 1961 was that "we didn't feel like sharing our lives together as man

and wife. We were incompatible." The upshot of these renewed difficulties was that the defendant moved from the quarters she had been sharing with the plaintiff to a separate apartment. It is the plaintiff's position that the defendant then acquired a paramour, a man named Larsson.

According to the plaintiff's evidence, after he and the defendant had returned to California and had subsequently discovered that they did not desire to be remarried, he and the defendant made an agreement to separate. In order to assist the defendant as much as possible, he found an apartment for the defendant, paid a part of the rent, furnished the apartment, and stocked it with some groceries. The plaintiff was obliged, he said, to borrow money to do so. Within a very short time, the defendant called the plaintiff by telephone and stated that she was going to move but refused to disclose her new address to the plaintiff; he heard nothing further from her until the middle of September, 1961. From July until the middle of September, the plaintiff had not been permitted to visit the child. However, the defendant's bank had sent her statement to the plaintiff by mistake and plaintiff, in going through the statement, had discovered that one of the checks bore an address on Chadron Avenue in Gardena, California; by comparison with the telephone directory, it was shown in evidence that this was the address listed for a Mr. Bo Larsson.

The defendant again called the plaintiff "about the middle of September," stating that she was in financial difficulty and needed money. Upon being asked where the child was, the defendant informed the plaintiff that the child had been sent back to Missouri. The defendant asked the plaintiff to meet her on a street corner near the Chadron address listed as being Mr. Larsson's, and during the evening the plaintiff and defendant met on this street corner. At this time, according to the plaintiff, the defendant admitted that she had been cohabiting with Mr. Larsson and "told me at the time that she had no other

choice than to send the child back to Missouri because Mr. Larsson didn't want the child to be with them." The plaintiff maintains that at this time he informed the defendant of his intention to seek custody of the child and that the defendant agreed. The evidence shows that in October 1961 he did institute a habeas corpus action in the trial court, which was unsuccessful, and that this Motion to Modify followed.

Throughout the trial, the defendant vigorously denied that she had been guilty of any immoral conduct with Mr. Larsson. It was her position that she had moved into an apartment of her own following the plaintiff's exhibition of his genital organs to the minor child, and that she had moved again because the plaintiff "kept watch on my apartment and kept track of every minute of every day * * * and I had asked for financial help and he refused to give it to me." As a result of this treatment, the defendant decided to move to a place where the plaintiff could not find her. It is undisputed that in August 1961 the defendant brought the minor child back to St. Louis where she turned the child over to the maternal grandparents. The defendant maintained that because she was "a nervous wreck," had no money, and was in a "run-down condition," she was obliged to return her child to the maternal grandparents.

Upon delivering the child to the custody of the maternal grandparents, the defendant immediately returned to California to resume her employment. The defendant at this time was living with two friends, Mr. and Mrs. Fredericks, who are often referred to here as Phil and Elaine. The defendant remained in California, living with Phil and Elaine Fredericks, until she returned to Springfield late in September. She remained in Springfield for two or three weeks on this visit and while she was here Larsson contacted her by telephone, advising her that he was taking his father on a cross-country trip. Larsson offered to stop in Springfield on this trip and offered to take the defendant back to California as he

returned. The defendant accepted this offer of transportation and returned to California with Mr. Larsson and his father. She insisted that neither on this trip nor on any other occasion had she ever had any improper relation with Mr. Larsson; she vigorously denied that she had ever resided with him or in the same building with him, and unequivocally denied ever having had sexual relations with him. According to the defendant's evidence, she met Larsson because he was the owner of a service station where the company cars were serviced. She met Larsson, according to her testimony, in the latter part of July and had several "dates" with him, and on one occasion took a short trip with him and Mr. and Mrs. Fredericks to Catalina Island. At the time of trial, the defendant was not informed of Mr. Larrson's whereabouts; she stated that as they were "only on a friendship basis anyway," she had never kept track of him.

The defendant explained her use of Larsson's address by saying that she put the address on the check (written by her for the airplane fare back to Missouri) because she did not wish to disclose her true address to the plaintiff, from whom she was hiding. It was shown in evidence that the defendant had given Mr. Larsson's address and telephone number to the maternal grandparents in case they needed to contact her. The defendant testified that she had arranged for Mr. Larsson to ascertain who called her and the purpose of the call, again because she did not wish to disclose her true address to the plaintiff. At another point during the trial, the defendant stated that she was advised by her friend Elaine to use Mr. Larsson's address on the check "and I did it without thinking." It was shown that Mr. Larsson was an unmarried man, age 23, at trial time.

The plaintiff also undertook to show by his evidence that Mr. Larsson had advanced the money necessary to return the minor child to Missouri in August 1961. The defendant maintained, on the other hand, that she had borrowed the money from a Mr. and

Mrs. Cummings, who were the managers of the apartment building where Mr. Larsson lived, although the defendant admitted that Mr. Larsson had delivered the money to her and that he had guaranteed repayment of the sum she borrowed. She was explicit in stating that she had done everything she could to keep the plaintiff from seeing the child and that she intended to keep doing everything she could to keep the plaintiff from seeing the child "because she remembers this treatment of him or parading nude in front of her, and I don't want my child around him again."

At the close of the trial, the court made an interim order allowing the defendant to remove the child to California, but the order recited that no final judgment was being entered. Shortly thereafter, the plaintiff filed a motion requesting permission to introduce additional evidence in the form of depositions to be taken in California, and at the same time applied for the issuance of a commission to take the depositions of Mr. and Mrs. Cummings and Mrs. Fredericks. The defendant did not oppose the introduction of additional testimony beyond moving the court to stay the proceedings until all child support due the defendant was paid, and until a reasonable amount of suit money was paid to the defendant in order for her to employ counsel to appear when the depositions were taken.

We shall discuss these depositions in greater detail in the course of this opinion. It is sufficient here to say that Mr. Cummings' deposition indicated that he had never loaned any money to the defendant and that the defendant had been a frequent visitor in Larsson's apartment; Mr. Cummings was of the opinion that the defendant had visited the apartment almost every day and on one occasion entered the apartment and remained there, alone, while Mr. Cummings was working on the apartment.

Mrs. Cummings stated that she had never given Mr. Larsson any money for the defendant and that she had never been asked by the defendant for any loan. On one oc-

casion, the defendant had received some mail at Mr. Larsson's apartment but Mrs. Cummings was unable to say how frequently the defendant had visited Mr. Larsson at his apartment.

Mrs. Fredericks testified by deposition that the defendant had only lived with her three or four days and that on the occasions during which the defendant said she was living with Mrs. Fredericks, the defendant was actually living with Mr. Larsson. The witness knew this because the witness' husband had helped move the defendant into Mr. Larsson's apartment. According to Mrs. Fredericks, Mr. Larsson had accompanied the defendant to the airport when the child was returned to Missouri in August 1961. Mrs. Fredericks was positive in her statement that the defendant had lived with Mr. Larsson for a considerable period of time. Mrs. Fredericks stated that she had been asked by the defendant not to give a deposition because "if I did, I would be the cause of her losing her baby."

Some time later, after the depositions had been taken and filed, the plaintiff made a written tender of the depositions to the court. The defendant, by counsel, then addressed a letter to the court in which he stated that he had not had a chance to read nor object to the depositions and in which he requested an opportunity to examine them before the court considered them as evidence. Nothing further was done until November 30, 1962, at which time the trial court awarded custody to the plaintiff, with permission to remove the child to California. It is significant that in the interim between May 1 and November 30, when the final decree was entered, the plaintiff had remarried. We note that the only semblance of evidence concerning the plaintiff"s present wife is an affidavit filed on October 30, 1962, in which the plaintiff and his present wife state that they intend to establish a home in Hawthorne, California, early in 1963; that the plaintiff's present wife has a young child of her own and ordinarily is employed as a nurse. The plaintiff's present wife had

added a statement to the affidavit to the effect that she desires to have the child in her home. There is no evidence of any nature other than this affidavit concerning the plaintiff's new wife, nor the surroundings in which the child will be placed if she returns with the plaintiff to California.

Sundry points have been ably briefed and argued on this appeal, but the view we take of this case makes it unnecessary and probably inappropriate to deal with all the contentions of error. We therefore limit our consideration of the points raised to: (a) the assignment that the Fredericks deposition was erroneously received, and (b) defendant's contentions, which are in substance that the trial court erred in awarding custody to the plaintiff upon the basis of a mere affidavit, without a judicial inquiry concerning the home environment in which the minor child is being placed.

The appellant, as we understand her, maintains that Mrs. Fredericks' deposition was erroneously received in evidence for two reasons. She says first that she received no notice of the taking of depositions, other than that imparted by the motion to receive further testimony, which incorporated an application for a commission to take depositions. Defendant maintains that without the separate notice required by Rule 57.08, V.A.M.R., the commissioner had no authority to take the depositions. Defendant makes the further assertion that since the taking of Mrs. Fredericks' deposition was adjourned to a place different from that specified in the commission, the commissioner was without authority to take Mrs. Fredericks' deposition, even if it be conceded the notice was sufficient.

The Fredericks deposition must be considered in context. The events which made up the purported change of circumstances in this case had actually occurred in California. Both parties proposed to take the child there. Only the parties themselves, however, had testified as to their living conditions and day to day conduct while they were in California. As the trial court's

record entries show, he understandably felt that he should have further information concerning the home into which the child would be received in California, were she taken there. An interlocutory order was therefore entered permitting the defendant to take the child to California, subject to an investigation of defendant's home there. It was specifically provided that the cause would remain on the trial court's docket pending this investigation. It does not appear whether this investigation was ever begun or even ordered, but almost immediately the defendant addressed a letter to the trial court advising him that she had now decided to return to Springfield, Missouri, "at least temporarily." Thereafter, the plaintiff moved the court for permission to introduce additional testimony, combining his motion with an application for a commission to take the depositions of three witnesses, whose names he specified, along with the time and place at which he wished to take the depositions. The record does not reflect that the defendant made any specific objection to the hearing of additional testimony; she appears to have contented herself with a motion to stay the proceedings (based on plaintiff's alleged failure to pay child support) and a motion for additional attorney's fees. Both motions were denied. The trial court issued a commission to take depositions, specifying that the depositions were to be taken on a particular day at a particular place.

At the time stated in the commission, two of the three proposed witnesses appeared and were interrogated by attorneys for the plaintiff and defendant. Mrs. Fredericks did not appear, and after the first two witnesses had been interrogated the plaintiff's attorney requested that the taking of her deposition be adjourned to a hospital about a mile away. Mrs. Fredericks had entered this hospital the preceding day. The defendant's attorney then entered an objection that the adjournment was outside the scope of the commission and stated that he would not appear. Plaintiff's attorney proceeded to take Mrs. Fredericks' deposition in

the other attorney's absence, and she testified as we have indicated.

The depositions were filed in the trial court on August 31, and on September 13 the plaintiff offered all three depositions in evidence by written tender. A copy of this tender was served on the defendant's attorney. On the same day, the defendant's attorney addressed a letter to the trial court stating that he had had no opportunity to read the depositions, nor to make any objection, and requesting an opportunity to do so before the court received the depositions in evidence. Upon the record before us, it appears that the trial court then waited 78 days for objections to be made by the defendant. None were forthcoming and on November 30 the trial court entered a judgment modifying the custody provisions of the original divorce decree by awarding custody of the minor child to the plaintiff.

■ We think there is no substantial merit in the defendant's contention that she did not receive proper notice of the taking of the depositions. She did, after all, participate in the proceeding up to the proposed adjournment. She entered an appearance by attorney and cross-examined the first two witnesses. This participation in the proceedings, in our opinion, constituted a waiver of proper notice [1] and the appellant may not now complain upon this ground.

■ The defendant also says that the Fredericks deposition was erroneously received because it was not taken at the place specified in the commission. The substance of her point is that since the commissioner's authority was limited to the time and place set forth in the commission, he exceeded his authority in adjourning the deposition to another place. The respondent answers that any irregularity in the taking of the deposition has been waived.

We believe the respondent's position is well taken. The defendant had made no substantial objection to the action of the trial court in permitting the introduction of further testimony, although she had been advised precisely of the nature of the testimony which the plaintiff sought to adduce. She had appeared and participated in the interrogation of two of the proposed witnesses. The defendant presumably became aware of the contents of the depositions on August 31 and was advised on September 13 that the plaintiff sought to tender all three of the depositions in evidence. By the terms of the trial court's interlocutory order, the cause remained on the docket and presumably the defendant would have been heard on any objections she had to the introduction of these depositions, had she requested the opportunity. Seventy-eight days elapsed between the time of tender and the entry of the judgment. The record does not reflect that any motion to suppress the depositions or other written objection was filed. Objections relative to the manner in which a deposition is taken—as distinguished from objections to the competency and relevancy of the evidence contained in the deposition—must be brought to the trial court's attention at the earliest reasonable opportunity so the trial court itself may correct such errors or irregularities. Otherwise, such objections are waived.[2] Since the defend-

1. Seymour v. Farrell, 51 Mo. 95, 97; Goodfellow v. Landis, 36 Mo. 168, 171; Tayon v. Ladew, 33 Mo. 205, 210; Crenshaw v. Pacific Mutual Life Ins. Co., 71 Mo.App. 42, 53.

2. Hoyberg v. Henske, 153 Mo. 63, 74, 55 S.W. 83, 86, signatures of the witnesses, notice of taking of deposition, and authentication by notary, matters of form which are waived in absence of timely motion to suppress; Bell v. Jamison, 102 Mo. 71, 76, 14 S.W. 714, 715, defective notice, waived by failure to file timely motion to suppress; Empire Dist. Electric Co. v. Johnston, 241 Mo.App. 759, 763–764, 268 S.W.2d 78, 80–81 [1, 2], disqualification of notary on ground he was party's attorney waived when no objection made up to time of trial; State ex rel. Ford v. Rudolph, Mo.App., 29 S.W.2d 199, 200 [3, 4], propriety of granting continuance in taking depositions a question of error, to be raised by motion to suppress; Hutchens v. Wagner, Mo.App., 274 S.W. 105, 106 [1], ob-

ant had not objected on principle to the trial court's hearing further evidence, and had filed no written objection of any kind for two and one-half months after the depositions were tendered, we think the trial court might reasonably have concluded that the defendant had no objection to its reception of the Fredericks deposition or, if she had, that she intended to waive it. We therefore conclude that the Fredericks deposition was properly received in evidence.

■■■■ We must agree with the appellant as to her contention that the trial court awarded custody of the minor child without sufficient inquiry into the home environment in which she was being placed. In so ruling, however, we feel bound to say that the trial court's action in taking custody from the defendant and awarding it to the plaintiff was amply supported by the evidence. The court found that the defendant perjured herself in testifying as she did about her association with Mr. Larsson, and he interpreted the evidence as indicating that the defendant's interest in her child has been secondary to her interest in Mr. Larsson. We agree that the record evidence is subject to this construction. Deliberate misrepresentation of the facts by one or another party to a custody action indicates that the party is probably an unsuitable custodian of the child,[3] as does a manifest lack of interest in the child.[4] Our detailed recitation of the

facts makes it clear that the trial court could reasonably have found that the defendant had represented her relationship with Mr. Larsson as an innocent friendship, when in fact it was an illicit liaison, and that she had subordinated her duties as a mother to her obligations as a mistress by placing the child with her parents so she might consort more freely with her paramour. We review these cases de novo, but we defer to the trial court's finding unless it is "clearly erroneous." Rule 73.01(d), V.A.M.R. The trial court was obliged to make an award of custody upon the basis of conditions as they existed when the case was tried,[5] and viewing the record in that light, we perceive no clear error.

■■■■ This does not dispose of the fact that the child has been sent out of the jurisdiction into a home concerning which no apparent investigation has been made. We venture to say that no single consideration is more important in awarding the custody of a minor child than the home environment in which he or she is to be placed. Insofar as it is reasonably possible, the court should not only assure itself that the home is one in which the conventions and mores of the day are scrupulously observed, but should inquire as diligently as possible into the home environment and the surroundings in which the child will be reared.[6] And while the remarriage of either parent is not a suf-

jections for irregularity in taking of a deposition should be made promptly and before trial; Abbott v. Marion Mining Co., 112 Mo.App. 550, 554, 87 S.W. 110, 111, testimony taken by stenographer when notary was absent, waived by failure to move to suppress before trial. Cf. Moore v. Keesey, 26 Wash.2d 31, 173 P.2d 130, 140–141 [9], power of resident notary to act out of state must be tested by motion before trial. See also 16 Am.Jur., Depositions, § 93, p. 738.

3. L——— v. N———, Mo.App., 326 S.W. 2d 751, 756; E——— v. G———, Mo. App., 317 S.W.2d 462, 467 [1]; S——— v. G———, Mo.App., 298 S.W.2d 67, 77 [14]; Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 328.

4. Dansker v. Dansker, Mo.App., 279 S.W. 2d 205, 209–210 [6]; Hensley v. Hensley, Mo.App., 233 S.W.2d 42; Rex. v. Rex, Mo.App., 217 S.W.2d 391, 394 [4]; 17A Am.Jur., Divorce and Separation, § 843, p. 35.

5. C——— v. B———, Mo.App., 358 S.W. 2d 454, 460; In re S———, Mo.App., 306 S.W.2d 638, 641 [2, 3]; Daugherty v. Nelson, 241 Mo.App. 121, 141, 234 S.W.2d 353, 365; Ex parte DeCastro, 238 Mo.App. 1011, 1028, 190 S.W.2d 949, 959.

6. Jenks v. Brown, 250 Ala. 534, 35 So.2d 359; Rust v. Trapp, Iowa, 201 N.W. 565, 566 [3]; Hardman v. Hardman, 308 Ky. 284, 214 S.W.2d 391, 392–393; Hild v.

ficient ground to award or deny custody, the trial court should be advised concerning the disposition and character of the stepparent, the presence or absence of other minor children in the home, and the mutual attitude or feelings of the child and stepparent, before awarding custody to a remarried parent. See Anno., 43 A.L.R.2d 363, 366–370; 17A Am.Jur., Divorce and Separation, § 840, pp. 33–34.

We do not minimize or brush aside the difficulty in obtaining reliable information which is also competent evidence in a case of this kind. We are also aware that the able and conscientious trial judge may have had full personal knowledge of the prospective stepmother's background, character and fitness as a custodian of the child. However, that is not sufficient. So far as the record shows, the only knowledge which the court had about the plaintiff's new wife and home came from a short affidavit. While this affidavit gave the trial court personal knowledge of a change in the plaintiff's situation, it did not amount to proof. The trial court does have wide discretion in a case of this kind, but this discretion must be a judicial one, subject to review upon record evidence. It is elementary that the individual and extrajudicial knowledge of a judge does not dispense with proof of those facts which cannot be judicially noticed. For this reason, an award of custody cannot be made solely upon the basis of ex parte statements, nor upon the basis of the court's personal knowledge.[7] Because of this complete lack of proof concerning the home environment in which the child is being placed, we conclude that the judgment must be reversed and the cause remanded so the trial court may hear such evidence as is available concerning the plaintiff's present home situation, though we do not mean by anything we say to limit the scope of his inquiry into the present circumstances of both parties.

The judgment is therefore reversed and the cause remanded for action not inconsistent with the views herein expressed.

RUARK, P. J., and STONE, J., concur.

---

Hild, 221 Md. 349, 157 A.2d 442, 446 [2, 3]; Osborn v. Osborn, 143 Neb. 1, 8 N.W.2d 444, 445 [2]; Griffith v. Griffith, 240 N.C. 271, 81 S.E.2d 918, 921 [1, 2]; Clemens v. Clemens, 20 N.J.Super. 383, 90 A.2d 72, 77 [9]; Thalassinos v. Thalassinos, Sup., 77 N.Y.S.2d 311, 314, aff'd. 274 App.Div. 807, 81 N.Y.S.2d 155; Hill v. Hill, 257 Wis. 388, 43 N.W.2d 455, 457–458 [6]; 27B C.J.S. Divorce § 309 (5), p. 463.

7. Walker v. Eldridge, 219 Ark. 594, 243 S.W.2d 638, 639 [1, 2]; Cohn v. Scott, 231 Ill. 556, 83 N.E. 191, 192; Wacker v. Wacker, 279 Ky. 19, 129 S.W.2d 1043, 1045 [4, 5]; Laurance v. Laurance, 198 Or. 630, 258 P.2d 784, 787 [1]; Darnell v. Barker, 179 Va. 86, 18 S.E.2d 271, 274 [3] [4, 5]; 2 Nelson, Divorce and Annulment, § 15.48, pp. 252–254 (2d ed. 1945).