C——, Plaintiff-Respondent,

v.

B——, Defendant-Appellant.

No. 8014.

Springfield Court of Appeals.

Missouri.

June 12, 1962.

Miller, Fairman, Sanford, Carr & Lowther, Mayte Boylan Hardie, Gerald H. Lowther, Springfield, for defendant-appellant.

Clay Cantwell, Branson, for plaintiff-respondent.

STONE, Judge.

This is an appeal by B——— (hereinafter referred to as the mother) from that portion of the decree in a divorce suit by C——— (hereinafter referred to as the father) which awarded to the father care and custody of K——— (hereinafter referred to as the child), their minor daughter about 7½ years of age at the time of trial and now 8½ years of age.

The father, then 19, and the mother, then 17, first took their marriage vows, "till death do us part," on January 25, 1953. Before their child entered this world about nine months later, the father had gone into military service. Following his discharge in March 1955, the father and the mother lived together about seven months. Shortly after their separation in November 1955, that marriage was terminated by a decree granting a divorce to the mother (upon grounds not here disclosed) and awarding to her custody of the child. On January 10, 1959, the father, then 25, and the mother, then 23, took the same marital vows again. Exactly four months thereafter, towit, on May 10, 1959, this remarriage ran aground when (as the father alleged and as the trial court found) the mother "deserted" the father and, rejecting his plea to return to the family home, went to St. Louis where she remained until September 1960.

In his petition in conventional form filed on December 3, 1960, the father charged general indignities and sought a decree of divorce and custody of the child. In her answer filed on January 3, 1961, the mother admitted the marriage and separation and the birth of the child, denied all other allegations in the petition, and affirmatively averred that "it would be to the best interests of the (child) that she remain in the care and custody of the defendant (mother)." At the outset of trial on February 27, 1961, the mother's then counsel (not appearing on appeal) announced that "the defendant (mother) desires to introduce testimony to show that (she) is . . . a fit and proper person to have the care and cus-

tody of the child . . . but the divorce itself is not to be contested."

In addition to supporting the charges in his petition, the father testified that he was a plumber with average annual earnings of approximately $4,000; that he then lived with his parents (in their middle sixties) in their farm home; that, when the mother went to St. Louis, she left the child with the maternal grandmother, then 55 years of age, in a neighboring county seat; that he had contributed varying amounts to the child's support and had given her clothes and presents; that, in his opinion, he could care for the child and rear her properly and, if awarded her custody, he would keep her with him in the home of the paternal grandparents; but that, if the court granted custody to someone else, he would contribute $30 per month (the sum suggested in the question propounded) for the child's support. On direct examination, the father also expressed the opinion (without objection) that either he or the mother "would be a proper and fit person to care for this child"; and, on cross-examination, he conceded the further opinion (without objection) that "it would be to the best interest of the minor child if the court would see fit to grant the care and custody of the child to your wife (the mother)" and that he was willing for the court so to do. After two character witnesses had testified for the father, his counsel rested and the mother took the stand.

The mother having stated that the child was at the home of the maternal grandmother, counsel inquired whether "you (the mother) and your mother (the maternal grandmother) and little girl live there in your mother's home" and the mother replied, "yes, but I am in ———," naming a city about sixteen miles distant (hereinafter referred to as the nearby city). After further interrogation had developed that the mother was working regularly in the nearby city and that her hours of employment included three nights each week, counsel sought the mother's assurance that "when you are not working, you can be

home and look after your little girl" but elicited only the uneasy, uncertain reply, "I think so." However, the mother definitely stated that she desired the custody of the child, that she had contributed to the child's support, and that, if the father would contribute $30 per month, she could "finish out the amount it (would) take to support the child for the present." The mother was not cross-examined. On this record, the trial judge took the case under advisement.

At a further hearing on April 3, 1961 (with the same attorney again appearing on behalf of the mother), the *father's* counsel called the *maternal* grandmother to the witness stand. She told the court that she had reared three children (including the mother), all of whom were grown and away from home, and that the child had lived with her "about all of (the child's) life" and was living in her home at the time of hearing. The child then was in the second grade at school. The maternal grandmother, a widow, was employed in a hardware store, and a baby-sitter cared for the child during those hours when the grandmother was at work and the child was out of school. The father theretofore had contributed "a little" and the mother had provided clothes and had paid "some" for the child's support. At the conclusion of the grandmother's testimony, the court entered a decree granting a divorce to the father and awarding legal care and custody of the child to him. At the same time, the court told the grandmother that "if he (the father) wants to leave the child at your home and pay for it, that will be all right."

Nine days later, towit, on April 12, 1961, the mother (then represented by counsel appearing here) filed "Motion to Amend and Modify Judgment as to Custody and, in the Alternative, Motion for New Trial as to Custody." The only *factual* allegation in paragraph 1 of the *motion to amend and modify* was that *the mother "has remarried and can provide a proper home for said child,"* to which were coupled conclusionary statements that "it would be to the best interests of said child to be in (the

mother's) care and custody" and that "there is additional evidence . . . which . . . would show that (the mother) would be the proper person to have custody of said child." Paragraph 3 of the motion contained no more than the curiosity-pricking hint that "much" of the evidence "is new and (has) occurred since the date of hearing on this matter." Sandwiched between the foregoing were the allegations of paragraph 2 that the mother "was taken by surprise by the ruling of the court as to custody in that she was informed and did believe that an agreement had been reached between her and the plaintiff (the father) and their respective counsel" that all of them "would recommend to the court that said child be placed in custody of defendant (the mother)," and "that defendant was present and willing to testify and refrained from testifying because of the fact that it was her understanding that such testimony was not necessary in order for her to secure the custody of her seven-year old daughter." With respect to the last-quoted allegation, counsel who drafted the motion obviously were misinformed for, as we have noted, *the mother did testify.* See the brief digest, supra, of her testimony. The *alternative motion for new trial* incorporated by reference all three paragraphs of the motion to amend and modify and added general statements "that there was insufficient evidence to support the judgment and decree as to custody," that "the evidence showed that this defendant (the mother) was the proper person to have the care and custody" of the child, and that "there was no evidence showing that defendant was an unfit mother or that she was unable to properly care for, support, raise and train said child."

The transcript before us contains the reporter's recital (but no order or docket entry so showing) that the mother's motion for new trial as to custody was sustained on May 23, 1961. In any event, additional evidence on this issue was taken at that time. The mother again testified, reiterating in substance much of her testimony at the initial hearing on February 27 and adding supplemental detail. She made a somewhat broader claim that she had supported the child from the separation of the parents in May 1959 to the initial hearing in February 1961, explained that the child had not been with her in St. Louis while she was there from May 1959 to September 1960 because "my mother (the maternal grandmother) preferred that I not take her" and (when pressed by her counsel for "some other reason") because "I didn't have enough money to take her (the child) with me," and said that during the period of her residence in St. Louis "I came home once or twice a month." But, she still did not say why, when she left her husband, she had chosen residence in St. Louis and separation from the child rather than residence in the county seat (her home before and between her marriages) or in the nearby city which would have permitted her to be with the child outside working hours; and she divulged no information concerning her activities in St. Louis or (if it be inferable that she had worked there, although there was no testimony to that effect) concerning the nature of her employment. The mother's testimony disclosed that, during the period from the initial hearing on February 27 to entry of the decree on April 3, 1961, she had lived in the home of her mother (the maternal grandmother) "part of the time" and had lived in the nearby city "part of the time"; but, why she chose residence in the nearby city and separation from the child "part of the time" remained another wholly-unanswered question.

*On April 5, 1961, two days after entry of the decree in this case, the mother married one J———.* When asked on cross-examination whether she had known J——— "for quite some time," the mother first offered the unresponsive, uninformative answer that "we are married" but subsequently conceded that "I've known him six or seven months." The total extent of the evidence pertaining to the mother's situation after entry of the decree on April 3, 1961, was her testimony

that she and J——— live in a four-bedroom house in the nearby city and that there are no children in the home "at this time." There was no showing that she had terminated her employment or that her hours of work had changed. Invited by her attorney to state whether she had given the child religious training, the mother glibly answered, "yes, I have"; but, when asked to explain, her more revealing answer was that "she (the child) goes to church at . . . I haven't gone with her for quite some time now, but she went with my mother (the maternal grandmother)."

At the hearing on May 23, 1961, the maternal grandmother testified again, this time upon call by the mother's counsel. Reiterating her love and ability to care for the child and the fact that "she (the child) has been with me all of her life, you might say —I have raised her," the gist of the grandmother's testimony was that, shortly after entry of the decree on April 3, 1961, she had made " a verbal agreement" with the father to care for the child in her home for $15 per week, that the father had come to the home of the maternal grandmother once each week to give her a check and to visit with the child, and that he also had visited with the child one Sunday evening.

The only other witness produced by the mother was an uncle, identified as a minister and a juvenile officer, who said that the mother's reputation for "truth, morality and veracity" was good and that he knew of nothing which would render her unfit to have the custody of her minor child. Neither of the examining attorneys probed the knowledge of this witness concerning her union with J——— two days after her divorce or invited this clergyman to essay an exposition as to how the hasty remarriage of his niece comported with the known moral tenets and teachings of the faith he professed and proclaimed.

In his testimony on May 23, 1961, the father confirmed his verbal agreement with the maternal grandmother to care for the child in her home for $15 per week, but he corroborated his attorney's statement (in a question) that *this agreement was that "she would take care of (the child) until school was out."* Conceding that he had not taken the child with him since he had been awarded custody on April 3, he explained that "I have asked for her several times and (the maternal grandmother) did not want me to take her (the child)." The father (not remarried) still lived with his parents in their farm home. Repeating (without objection) the opinion previously expressed that he could care for the child properly, he said that his parents (who, however, did not appear as witnesses) would not object to the child being in their home with him. Since the paternal grandfather had "a heart condition" (not further explored in the record) and the paternal grandmother had arthritis, although "she isn't crippled up with it," the father pointed out that his brother and sister-in-law with their two children, a boy 11 and a girl 8, lived directly across the road from the farm home of the paternal grandparents. And this sister-in-law, 32 years of age, followed the father on the witness stand and affirmed her willingness and desire to assist him in rearing the child.

Having held the case under advisement overnight, the trial court on May 24, 1961, entered a second judgment as to custody, finding that "the best interest of the child . . . would be served by leaving her in the custody of her natural father" and awarding custody to him subject to the mother's "right of reasonable visitation." We observe parenthetically that the basic issue, towit, what would be best for the child, has been presented to us in a procedural hurrah's nest, thrown together in the course of the mother's brash and unprecedented legal maneuver to procure a reversal of the original decree as to custody by showing changed conditions (i. e., her hasty remarriage two days later) upon a reopening of or a rehearing in the original action rather than in a hearing upon a conventional motion to modify which is treated as a petition in an independent proceeding

in which new rights based upon new facts are adjudicated. Hayes v. Hayes, 363 Mo. 583, 589–590, 252 S.W.2d 323, 327–328. But, with no procedural point raised by counsel and with the mother in good faith attempting to appeal from the final decree as to custody [Walker v. Thompson, Mo., 338 S.W.2d 114, 116(4)], we purposely pass procedural problems and proceed directly to the basic issue, acutely aware of the finite limitations imposed by human frailty and fallibility upon courts, counsel and parties alike, and profoundly impressed with the heavy responsibility and grave solemnity attendant upon discharge of our duty bearing upon the sacred relationship between parent and child, involving the future course of an innocent girl, and perhaps influencing the eternal destiny of an immortal soul.

To support their conclusions in custody cases, courts and counsel alike are fond of seizing upon and reiterating commonplace truisms which, from time to time, have found application in certain circumstances. When simply recorded without examination of the factual situations invoking their use, some of those principles may not, at first blush, appear to be entirely consistent with each other. For example, some cases caution that the success of one parent is not the *controlling* factor in determining whether that parent should be given custody of minor children [McKenzie v. McKenzie, Mo. App., 306 S.W.2d 588, 591(3); Bedal v. Bedal, Mo.App., 2 S.W.2d 180, 184(7); Zerega v. Zerega, Mo.App., 200 S.W. 700], while others tell us that *ordinarily* the custody of children is awarded to the party who prevails in the divorce suit. Harwell v. Harwell, Mo.App., 355 S.W.2d 137, 142; Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 776(6); Wells v. Wells, Mo.App., 117 S.W.2d 700, 704. And it has been said many times that, *all other things being equal,* the custody of children of tender years, particularly girls, will be granted to the mother [Edwards v. Edwards, Mo.App., 302 S.W.2d 37, 39(2); S———— v. G————, Mo.App., 298 S.W.2d 67, 78(19); Ballew v. Ballew, Mo.App., 288 S.W.2d 24, 26(4); Long v. Long, Mo.

App., 280 S.W.2d 690, 694(5)] while it has been pointed out no less frequently that, *where the best interests of children will be served thereby,* their custody will be awarded to the father. Harwell v. Harwell, supra, 355 S.W.2d loc. cit. 143; Davis v. Davis, Mo.App., 354 S.W.2d 526, 528(3); Tootle v. Tootle, Mo.App., 329 S.W.2d 218, 224; L———— v. N————, Mo.App., 326 S.W.2d 751, 755(6), and cases collected in footnote 8. On the one hand, we read that, *unless both parents are unfit,* legal custody of their children must be granted to one or the other [Paxton v. Paxton, Mo.App., 319 S.W.2d 280, 289], while, on the other hand, we find that, *where the welfare of the children so demands,* the legal rights of the parents must give way and custody will be vested in others. LeClaire v. LeClaire, Mo.App., 352 S.W.2d 379, 381(1).

■ But, all of these principles, useful as they may be under certain circumstances, are hedged and qualified, clearly to be employed only when their application would be consonant with and in furtherance of the only rigid, inflexible and unyielding principle in custody cases, namely, that the welfare of the children in each instance is the paramount and supreme consideration to which all others must submit and give way. See cases collected in West's Missouri Digest, Vol. 11, Divorce, ☞ 298(1). So, although we again refer to the recited principles, we here recognize, as we have in other such cases [e. g., Davis v. Davis, supra, 354 S.W.2d loc. cit. 528], that courts must resolve pressing problems of custody not by applying academic rules or by mouthing pious platitudes but rather by determining, insofar as is humanly possible, what will best serve and promote the welfare of the children involved.

■ In this category of cases, the court frequently is confronted with the necessity of making an exceedingly difficult choice, not between black and white but between different shades of gray [E———— v. G————, Mo.App., 317 S.W.2d 462, 468]; and, so it is in the case at bar. We cannot

say *with certainty* that the best interests of the child will be served by leaving legal custody in the father. For, it is not reassuring to note that *during 1960* the father called on the child at the home of the maternal grandmother only twice, towit, at Easter and at Christmas; that, although the father ventured an uncertain opinion that he had contributed "about $30 per month" for the child's support, the maternal grandmother said that he had paid her only the aggregate sum of $100 during 1959 (after separation of the parents on May 10 of that year) and only the aggregate sum of $85 during 1960; that, although stoutly denying "a drinking problem," the father frankly admitted that "I have enjoyed drinking beer"; that about three years previously he had hit two parked automobiles and had been convicted of careless and reckless driving; and that neither of the paternal grandparents testified at any of the three hearings. But, his fitness as a parent was to be determined as of the dates of the hearings [In re S———, Mo.App., 306 S.W.2d 638, 641(2); Ex parte DeCastro, 238 Mo. App. 1011, 190 S.W.2d 949, 959(14)]; and, with the father on the witness stand before him, the trial judge was in far better position than we are to appraise the father's candor, sincerity, character, and love for the child.

■ On the other hand, the record casts, we think, even deeper shadows on the mother and keeps her newly-acquired husband completely in the dark. Without further factual resifting and review, suffice it to say that, as in Davis v. Davis, supra, 354 S.W.2d loc. cit. 531, the evidence leaves us with a disappointed, disheartened, distasteful feeling that this mother's love for her child, *as manifested objectively by her conduct* during the period from the parents' separation in May 1959 to entry of the decree on April 3, 1961, was not of that sublime character which inspired one of our brethren (now departed) to exclaim that "(t)here is but a twilight zone between a mother's love and the atmosphere of heaven." Tuter v. Tuter, Mo.App., 120 S.

W.2d 203, 205. Even more importantly, the morals of the mother and J———, the head of the household into which the mother seeks to take the child, are of interest and concern. M——— v. M———, Mo.App., 313 S.W.2d 209, 212(1); Graves v. Wooden, Mo.App., 291 S.W.2d 665, 667(2); Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 74(4); Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 210(7). When we refer to "morals," we are not thinking solely of sexual conduct. L——— v. N———, supra, 326 S. W.2d loc. cit. 755. "Moral law" is "(t)he law of conscience" [Black's Law Dictionary, 4th Ed., p. 1160]—"'the eternal and indestructible sense of justice and of right written by God on the living tablets of the human heart and revealed in his Holy Word.'" Moore v. Strickling, 46 W.Va. 515, 33 S.E. 274, 277, 50 L.R.A. 279. "Morality is a generic term containing the sum total of all . . . moral traits, including honesty, fidelity, peacefulness, etc.," sometimes "referred to as synonymous with character" [State v. Moorman, 133 Mont. 148, 321 P.2d 236, 240]; and the very nature of the overriding principle in cases of this character, i. e., that the welfare of the children is paramount and supreme, dictates and demands that an inquiry into the "morals" of parents (and, we think, of stepparents as well) should encompass not only sexual conduct but also "common decency, cleanliness of mind and body, honesty, truthfulness, and proper respect for established ideals and institutions, among other things." State v. Clein, Fla., 93 So.2d 876, 881.

No doubt, there are those so credulous and naive as to believe that the mother's romance with J——— might have budded and blossomed into marital fruition figuratively overnight—literally over two nights —and so carnal and sophisticated as to think no immoral inferences permissible from the amorous association of those still bound to others by solemn marital vows. But, were we to be numbered among that group we would be more simple and stupid than counsel and their clients have the right

to suspect and more unregenerate and unworthy of our trust than they have the right to expect. Bluntly put but charitably stated, we are firmly of the opinion that, in the mother's remarriage with J—— the second day after her divorce, there are implications of "moral dereliction and lack of spiritual values" [Harwell v. Harwell, supra, 355 S.W.2d loc. cit. 143]; and that opinion is not softened by the state of the record before us, with J—— not appearing as a witness and with the transcript utterly devoid of explanation or information concerning the circumstances under which the mother's romance with J—— budded and blossomed, his marital status when he and the mother became enamored of each other, and (if he had been married previously) the date and cause of termination of that marriage. Furthermore, we note (as the trial court undoubtedly did) the absence of evidence bearing upon the attitude of J—— toward his own child or children (if any), the provisions made for their care and support, and *his feeling about the mother's desire to bring her child into his home* as to which we do not have even vicarious assurance by the mother that the child would be tolerated, much less wanted, by J——.

 It has been declared repeatedly that, although not binding upon the appellate court, the findings of the trial court as to custody of minor children nevertheless are not to be lightly regarded and easily disturbed, but that the appellate court should defer to such findings unless it is firmly convinced that the welfare of the children requires some other disposition. Davis v. Davis, supra, 354 S.W.2d loc. cit. 532(7); Tootle v. Tootle, supra, 329 S.W.2d loc. cit. 224(9); Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147(3), and cases collected in footnote 3. We believe that principle of deference applicable in the case at bar, where the trial court kept the matter of custody under advisement for several months, conducted three hearings, and had full opportunity to observe and appraise the parties and their witnesses, and where painstaking and agonizing consideration of the transcript leaves us unable to say that the welfare of the child would be better served by some disposition other than that decreed nisi.

We are mindful that the father, to whom legal custody of the child has been granted, must have the assistance of dedicated and devoted grandparents, either paternal or maternal, in the discharge of his parental duties and obligations. But, there is nothing strange or novel about that either to the courts [e. g., Sartin v. Sartin, Mo.App., 349 S.W.2d 705, 711–712] or to the mother in this case, who herself has chosen over the years to shift onto the maternal grandmother heavy responsibility for care of the child. Of course, the trial court retains continuing jurisdiction to modify the custodial provisions of the decree *upon sufficiently compelling proof of changed conditions* prior to majority of the child or the death of one parent, whichever first occurs. In re Wakefield, Mo.App., 274 S.W.2d 345, 347(5); Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 125(1).

The custodial decree under review is affirmed.

RUARK, P. J., concurs in separate opinion.

McDOWELL, J., concurs.

RUARK, Presiding Judge.

I concur. The trial judge was in a better position to assess the situation than we are. But I do not wish to be bound by concurrence in the statements from which it is to be taken that the mother, in her hasty remarriage, was *necessarily* guilty of immoral conduct therein or beforehand, either personally or legally. The parties had been separated for a year and a half. There *could* be circumstances, such as, for instance, where a mother, driven to desperation over fear of losing her child because she had no home to offer it, would contract

a hasty marriage with an old acquaintance. No witness testified to, and no evidence necessarily points to, the immorality or misconduct of the mother. I think we should not assume it.