J——— G——— W———, Plaintiff-Respondent,

v.

J——— L——— S———, Defendant-Appellant.

No. 8547.

Springfield Court of Appeals.
Missouri.

March 31, 1967.

William A. Moon, Springfield, for defendant-appellant.

Wayne T. Walker, Springfield, for plaintiff-respondent.

STONE, Presiding Judge.

This appeal brings for review a bitter contest concerning the custody of a boy N——, now six years of age, and a girl M——, now five years of age (hereinafter jointly referred to as the children), born of the marriage of plaintiff herein, the mother, and defendant herein, the father, which disintegrated in divorce on January 18, 1963. On that date, the mother voluntarily dismissed her petition for divorce, and the court entered a decree granting the father a divorce on his cross-complaint, and awarding major custody of the children to him with minor custody to the mother "on weekends" and "both parties to have the right of reasonable visitation."

The present proceeding was instituted on September 8, 1965, by the filing of the mother's motion to modify in which she averred, inter alia, that at the time of divorce she had no income and no place to keep the children; that "defendant [the father] agreed to and did keep said children with his mother, who was a fit and proper person"; that the father subsequently married a woman (hereinafter frequently referred to as the stepmother) who had two children; that the living quarters provided by the father for the children and the stepmother's children, four in all, are inadequate; that the stepmother "mistreats her stepchildren" and they "have become emotionally upset, nervous and dissatisfied"; that the mother also has remarried and her husband (hereinafter frequently referred to as the stepfather) is "a person of good character" who is willing and anxious for the mother to have full care and custody of the children; and that the welfare of the children would be served by granting full custody to the mother with a reasonable sum for child support.

In his answer to the motion to modify, the father generally denied that "the circumstances have materially changed" since entry of the original decree, specifically negated most of the averments in the mother's motion to modify, alleged that the mother's "own actions," while the children were with her on weekends, caused them "to be nervous and upset upon being returned" to the father, and prayed the court not only to deny the mother's motion but also to grant affirmative relief by deleting from the original decree the provision for the mother's minor custody on weekends and granting to the mother, in lieu thereof, the right of reasonable visitation.

After hearing, the trial court entered judgment finding the issues in favor of the mother, sustaining her motion to modify, awarding her full care and custody of the children with the right of reasonable visitation to the father, and ordering the father to pay $20 per week as child support and $200 as an attorney's fee. On this appeal by the father, his position is that "the evidence of the [mother] shows some change in conditions but it is far short to warrant modification of the decree and awarding custody of the two children to [the mother]." We approach the record, mindful of the applicable principle that, although proof of a change of condition is a prerequisite to modification of a custodial order [Simmons v. Trenter, Mo.App., 327 S.W.2d 936, 939(4); Lewis v. Lewis, Mo.App., 301 S.W.2d 861, 863(3)], "it is not sufficient simply to show *some* change in circumstances but that modification is justified and permitted only upon proof of changed conditions affecting the welfare of the children *to a substantial or material extent* [Application of Shreckengaust, Mo. App., 219 S.W.2d 244, 247(3); Hawkins v. Thompson, Mo.App., 210 S.W.2d 747, 751–752(3)] *and in a beneficial manner*. Frame v. Black, Mo.App., 259 S.W.2d 104, 108(4); Watkins v. Watkins, Mo.App., 230 S.W.2d 778, 783; Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 126(7)." (All emphasis herein is ours.) Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 73–74(3); McCoy v. Briegel, Mo.App., 305 S.W.2d 29, 39(18). See Thomas v. Thomas, Mo.App., 357 S.W.2d 208, 210(2); Jeans v. Jeans, Mo.App., 348 S.W.2d 145, 154–155; Birrittieri v. Swanston, Mo.App., 311 S.W.2d 364, 367(2).

In our inquiry as to whether or not there was a substantial and material change of condition affecting the welfare of the children subsequent to entry of the divorce decree of January 18, 1963, it becomes appropriate to ascertain first what condition existed at that date. Garbee v. Tyree, Mo. App., 400 S.W.2d 193, 195–196(3); S—— v. G——, Mo.App., 298 S.W.2d 67, 76(8). The father then was only twenty-four years of age, the mother just twenty-one. Although their material possessions were of relatively small value, the parties entered into a "Property Settlement Agreement," the only portion of interest here being "that [the father] is a fit and proper person to have the care and csutody of the minor children of the parties" and that, subject to approval of the circuit court, the father should have their major custody with the mother to have the children "on Saturday and Sunday of each week" and with each party to have reasonable visitation rights while the children were in the custody of the other party. As we have seen, that was the custodial arrangement embodied in the divorce decree.

Upon trial, the mother explained that her acquiescence in this custodial arrangement was a product of necessity. In her words, "I had no choice. I wasn't working . . . I had no way to keep the kids, no money, no place to take them. My folks were divorced, my mother was sick . . . she couldn't help me care for them." In her fleeting appearance on the witness stand, the *maternal* grandmother explained that she had been in the hospital "with a nervous breakdown . . . was taking two and three shots a week for my nerves . . . was taking tranquilizers at the same time" and that she was neither physically nor financially able to care for the children. Other evidence suggested that the maternal grandmother had both alcoholic and psychiatric problems.

The mother insisted that she had consented to the father's major custody of the children because of his oral agreement that the *paternal* grandmother, whom the mother recognized as "a fit and proper person," would care for the children. Although the father denied any such oral agreement, for a considerable period of time after the divorce both the father and the children did reside with his parents and, in fact, the paternal grandmother did care for the children. Upon trial, the mother had no complaint about the conduct of the paternal grandmother—she "was always nice" and

"there wasn't any trouble at all." As indicating the mother's alleged want of interest in the children during that interval, the *father* testified that the mother *took the children* only "maybe a third" of the weekends, and the *paternal grandmother* estimated that the mother *"missed* a third." The *mother,* agreeing with counsel that she had taken the children only "about a third of the time when [she] should have [had] them," offered the explanation that was so "because when I got there, they weren't home, that's why."

One L——, then twenty years of age, who later became the stepmother of the children, first entered the picture in October 1964 when she, together with her two sons "very near the same ages" as the children, moved into a two-bedroom home on K—— Street about six or seven blocks from the home of the paternal grandparents in one of the larger cities within our territorial jurisdiction (hereinafter referred to as the city). From that time forward, the father, already acquainted with L——, who was married but not living with her husband, began to take the children to L's house where (as the father put it) "she baby-set for me." "They [the children] stayed there a lot," virtually every day; and, although "it wasn't regular practice" for the children to remain overnight, sometimes they did. The father himself was at L's house almost every day and every evening, sometimes until a late hour but (so he insisted) never "all night," even though his automobile at times remained outside her house overnight—a circumstance explained by L—— as resulting when she would need transportation the following day and the father would leave his automobile at her house, walk home in the evening, and "catch a ride to work the next day." In any event, both the father and the children were at L's house so much of the time that L's next-door neighbor, called as a witness for the father, thought that the children and L's two sons were "all brothers and sisters" and assumed that the father and L—— were married— "if they wasn't married, I didn't

know it." During this period, the father and L—— occasionally went to stock car races and cafes and, on one Sunday in 1964, to "a night club" or beer tavern. When the mother's counsel suggested that "you [L——] were doing things that weren't quite accepted by society," L—— retorted "I was separated, and I feel that I had the right to do as I pleased . . . I am not the only person who has."

During April 1965, L—— and her two sons moved from the house on K—— Street in the city to her mother's home in a small town some fifteen miles distant (hereinafter referred to as the small town); and, "because of difficulties" in the mother's home, during June 1965 L—— and her sons moved to another address in the small town. It is not clear how frequently the children were with L—— during the period of her residence in the small town, but we are told that she did keep them overnight "once or twice" and that the father visited her "almost every night." On July 3, 1965, L——'s marriage was terminated by a decree of divorce entered in another county; and on August 7, 1965, L—— became the stepmother of the children by virtue of her marriage to the father. The father, the stepmother, the children and the stepmother's sons immediately moved into, and occupied at the time of trial, the same two-bedroom house on K—— Street where the stepmother and her sons had resided previously. The father and the stepmother used one bedroom, the four youngsters the other bedroom with the two older boys sleeping in a bunk bed and the youngest boy and girl "in baby beds." The stepmother opined that, for children four and five years of age, the house was "large enough."

The father testified that the children and the stepmother's sons "get along just like they was brothers and sisters," and the stepmother commented more expansively that "they get along quite well . . . better than I might have expected . . . they play well together . . . they take up for each other." With reference to the

stepmother's care of the children, the father said that she treated them "like she does [her] boys" and that she never abused them, and the stepmother's emphatic assertions were to the same effect. Her professed feeling for the children was reflected in this statement: "I love [the] children very much. I didn't give birth to them, I didn't have the pain that I had when I gave birth to my own [sons], but I feel having the pain doesn't make a mother. I have taken care of [the] children day after day, I have worked at being a mother, and you can't be a mother unless you work at it. And I do love them very much." Witness after witness, including not only five kinsfolk (i. e., the stepmother's mother, brother and sister-in-law and the father's mother and sister) but also eight other persons who had visited in the father's-stepmother's home (i. e., an insurance agent, four neighbors and three friends), attested to the stepmother's excellent care and impartial treatment of the children. Although the mother's motion to modify included a broad charge of mistreatment of the children by the stepmother, there was no evidence of such mistreatment and counsel for the mother has not relied upon that charge.

At the time of trial, the father had been employed for five "seasons" as a truck driver for a large highway construction company. His wages for a forty-hour week were about $125, but his income varied because his employment was, to some extent, seasonal. The stepmother stated that the father provided adequately for the family, and there was no evidence of financial difficulty.

We retrace our steps chronologically to take a closer look at the mother and the stepfather. The record sheds little light upon the mother's place of residence, conduct and employment between her separation from the father in August 1962 and her marriage to one W—— on May 9, 1965. We do know that, after the separation and prior to entry of the divorce decree on January 18, 1963, the mother worked in a bar in Kansas City for "around three months." She identified her place of employment only by the generalized description that "it wasn't just a bar; it was a very nice, exclusive cocktail lounge," coupled with the related comment "that was an honest, decent living." It is inferable that, during the remainder of the period prior to her marriage to W——, the mother lived in the city; but the only information about her during that period, injected without objection or denial, was offered by A——, W's first wife, who, at a time not fixed more definitely than that it was "close to a year" prior to December 2, 1965 (the date of hearing in the instant proceeding), divorced W—— and was awarded care and custody of the two children born of that marriage (i. e., two girls, then about eight and five years of age, one of whom was afflicted with cerebral palsy), and the sum of $40 per week for child support. When asked "did your husband [W——] live with [the mother] for almost a year before ——," A—— interrupted with this response: "I don't know the period of time. And I wish you would explain what you mean by 'living' because I don't want to condemn people. But if you mean I found them in the morning about five o'clock in her apartment—yes." Continuing, counsel inquired "over what period of time did this go on prior to your divorce" and elicited the answer, "several months; we were six months getting the divorce and it was quite a while before that."

In any event, W—— became the stepfather of the children by virtue of his marriage to the mother on May 9, 1965. That was during the period of about one year when the stepfather was "painting for himself." For some six weeks to two months during the Summer of 1965, the stepfather and the mother ran a bar in the small town; but they "let the lease go" (so the mother said) because "we didn't like it." Returning to the city, the stepfather was a painter "as long as the weather held out"; but, before the hearing on December 2, 1965, he had reverted to tilesetting, an occupation he had followed for

some thirteen years prior to the painting interlude. As a tilesetter, the stepfather did not receive a fixed wage but was paid for tile actually laid, with his weekly earnings fluctuating within the range of $110 to $130 per week (so he said) and with his "take-home" income approximating $100 per week (so the mother estimated).

About August 1965, the stepfather and mother moved to a "mobile park" near the city, where they lived in a trailer described as ten feet in width and fifty-five feet in length, with three bedrooms, two baths, a living room and a kitchen. They were paying $90 per month on the $5,350 unpaid balance of the purchase price of the trailer. The rental for the lot in the trailer park was not shown.

Although obligated by judgment to pay $40 per week to A——, his first wife, for support of the two girls born of that marriage, the stepfather was $1,080 in arrears in those payments at the time of hearing. His proffered excuse for admittedly failing to make any child support payment for several months was that, when he went to A——'s home to get the girls, she "raised a fit and told me to leave and not come back and said money didn't mean that much to her." When instant plaintiff (the mother) was interrogated about the stepfather's delinquency, she said "it isn't true that *we* didn't pay it because *we* didn't have the money; it's because . . . she [A——] didn't want it [child support], she wouldn't take it; she refused to let him see the [two girls] so she dropped it." Further defending the stepfather's failure to support his girls, the mother rationalized the situation in this fashion: "I can't see that he [the stepfather] is behind one payment, because she [A——] refused to take it, because she didn't want him to see the [two girls], so she would drop it and said, 'I don't want the money, keep it,' and run *us* off and threatened to call the police if *we* come back. Now why pay her when she don't want it?"

However, neither the conduct nor the testimony of A——, who at the time of hearing was working in a manufacturing plant, indicated that she had rejected or renounced child support from the stepfather. On the contrary, about June 1965 and again within a month before the hearing A—— had sought the assistance of the prosecuting attorney in her efforts to extract child support from the stepfather; and he conceded that, on the first of those occasions, "they came out and got me one night." After the prosecuting attorney contacted him on the second occasion, the stepfather paid $20 to A—— less than a week before the hearing. He had called A—— the previous week (so she testified) and "said that his trailer payment was due and he couldn't afford it [the child support payment] that week, but that I could have the remainder of his check the next week." As for the arrearage of $1,-080, A—— declared her firm intention to collect it, if at all possible. Against this sorry backdrop of nonsupport of his own girls, the stepfather glibly affirmed at the hearing that he could and would "also help support" the mother's children, for whom he professed considerable affection—"I think a lot of them; we have a lot of fun . . . and we get along real good together."

The record includes evidence reflecting the high temper, uncurbed conduct and unseemly language of both the mother and the stepmother L——. Perhaps the most egregious example of this was what we may refer to as the hospital scene in the Fall of 1965, which involved the two women and one of the children, namely, the girl M——, who, after several hours of intermittent wrangling between the father seconded by the stepmother on the one hand and the mother seconded by the stepfather and the maternal grandfather on the other hand, had been hospitalized for treatment of a severe episode of croup. Either the mother or the stepmother (they disagree as to which one) was holding the girl M—— in her hospital room; but, regardless of which one held the girl at the moment, the adult participants agreed that one of them (each again pointing the finger of blame at the other) jerked and pushed the other in an effort to

retain or gain (depending upon whose version is accepted) physical possession of the girl, and that the pushing and shoving culminated in the stepmother's slapping of the mother. The mother's account was that, although she "didn't say a word" to the stepmother, the latter "started hollering, 'Let me have that baby or I will slap you,' so I said, 'Go ahead,' and she did." But the stepmother, conceding that "I did strike her," asserted that she thus reacted only because the mother, jerking and pushing, "cursed me and the child." If any aspect of this donneybrook might be said to have reflected credit upon either participant, it is the fact that, although she did not turn the other cheek, the mother did not return the stepmother's blow but simply left the scene.

We also briefly note other testimony pertaining to the mother's language and conduct. The paternal grandmother, whose testimony as a whole was not suggestive of malice, told of a telephone conversation in which the mother had called her "an old bitch." A——, the stepfather's first wife, said that the mother called her at her place of employment and "swore over the phone so loud that the secretary to my boss . . and . . . several other business ladies around there . . . heard it" and that the mother said, among other things, that "if I [A——] came between her getting the children, that she would be out there that evening and she wanted me to understand that." Admitting the call but denying the profanity, the mother's milder version was that she said "A——, you have got your kids, let me get mine . . . . *We* will deal with you when this is over. . . . I want my kids; I don't want you in any way to try to keep me from getting them."

Both parties and their present spouses made reference to their church affiliations. The *father* testified that he was a member of a church in a community some thirty-five miles from the city but that he and the stepmother "occasionally" attended a local church. More enthusiastically but mayhap less carefully, the *stepmother*, although professing no church membership, asserted that "we go every Sunday." The *mother* was no more scrupulous and precise in her testimony. On direct examination, she identified the church to which "we [she and the stepfather] belong" and stated that "always on Sunday morning, we take them [the children] to Sunday school and church; we never let them miss . . . the children have gone there ever since we got married [on May 9, 1965] . . . we haven't missed yet . . . I don't want to see them taken out of Sunday school and church for any reason." On cross-examination, the mother's testimony was that she had been attending church for "possibly three months" prior to the hearing on December 2, 1965—"I have been going, not regularly in my membership (sic) but we have been attending," that she and the stepfather had joined the church "approximately two weeks ago," and that the children had been going to Sunday school there "approximately three months." The *stepfather* limited himself to the simple statement that "we joined it [the church] during a revival two weeks ago." Although the parties and their present spouses thus evidenced their common recognition of spiritual needs and moral values, we confess our inability to accord much significance to any of their self-serving statements of piety or religiosity, patently contradicted on the record by testimonial accounts and admissions concerning their language and conduct, for it is "by their fruits ye shall know them." Matthew 7:20.

With the parties involved in this proceeding being of the disposition and in the frame of mind exemplified by the foregoing factual review, friction frequently was generated by personal contacts between the mother and the father or the stepmother when, after the father's remarriage on August 7, 1965, the mother did exercise her right to weekend custody and to reasonable visitation at other times. Thus the mother complained that "on several occasions . . I can't even get in the front door to see the children, I have to stand on the porch and

they come to the door for maybe two or three minutes" and deplored her inability to take the children to a "neighbor child's birthday party" one evening and to take them bowling another evening. Answering these complaints, the stepmother averred that, on the single occasion when the mother was denied admission to the father's-stepmother's home and the children went to the front door, the father was not then at home and the mother was told to come back when the father returned from work about one hour later, and that the request to take the children to the "neighbor child's birthday party" similarly was denied for the time being "because the father was not home" and "she [the mother] told me that I had no right to say anything about the children [so] I told her to come back when their father was home." The bowling request received no further testimonial attention.

■ The mother particularly emphasizes the charge in her motion to modify that the "children have become emotionally upset, nervous and dissatisfied with their home life." The evidence bearing on this allegation principally pertained to the boy N——, who, according to the mother, told her "that he didn't want to live at [the father's] house" and, when returned there at the close of the mother's weekend custodial periods, cried and did not want to go inside. We cannot accept the mother's testimonial suggestion that custody should be changed to her because "he [the boy N——] is five and I think he is old enough to know what and where he wants to go," for certainly the wishes of a child of that tender age are not to be indulged if they are inconsistent with attainment of the paramount objective, i. e., furtherance of the child's welfare. Graves v. Wooden, Mo.App., 291 S.W.2d 665, 669(4); Fordyce v. Fordyce, Mo.App., 242 S.W.2d 307, 313–314(2); Wells v. Wells, Mo.App., 117 S.W.2d 700, 705(16–18). However, we are impressed by the ready agreement of the father that "a lot of times they did come back emotionally upset, especially the boy" and of the stepmother that "Sunday evenings, when they come home, they are awfully upset." True, both the father and the stepmother insisted that this was the result of what the mother told the children, that within fifteen to thirty minutes the children were normal again, and that they remained happy until "Saturday mornings [when] they get upset because they have to leave." Regardless of that, it is the established *fact* of the "emotionally upset" condition incident to weekend transfers of custody that assumes grave significance here and leaves us in no doubt but that the original custodial arrangement, entailing a physical and an emotional uprooting and adjustment for the children every weekend, affording to the interested adults frequent opportunities for the reactivation of old resentments and suspicions and for the creation of new ones, and exposing the children to the bickering and backbiting of those adults, no longer serves the best interests of the children and should be eliminated. See M—— L—— v. M—— R——, Mo.App., 407 S.W.2d 600, 604(11); Wood v. Wood, Mo.App., 400 S.W.2d 431, 437(8); Kimble v. Kimble, Mo.App., 399 S.W.2d 630, 634(7).

■■ Although the decree of modification under review does eliminate the weekend custodial transfers, the question remains as to whether such elimination by the granting of full custody to the mother, subject only to the father's right of reasonable visitation, would serve the best interests of the children. We are cognizant of the broad general principle, upon which the mother's counsel leans heavily, that, *all things being equal,* the custody of children of tender years belongs with their mother. See cases collected in 11 West's Missouri Digest under Divorce, ☞298(6), and in 22A West's Missouri Digest under Parent and Child, ☞2(3.2). But as we recently commented, "all things never are exactly equal" [Garbee v. Tyree, supra, 400 S.W.2d at 199]; and a profusion of cases convincingly demonstrates that the courts do not hesitate to entrust children into their father's care and custody, where the best interests of the children will be served there-

by. M—— L—— v. M—— R——, supra, 407 S.W.2d at 603(5), and cases there collected. The only rigid, inflexible and unyielding principle in custody cases is that the welfare of the child is paramount and supreme [see cases collected in 11 Missouri Digest under Divorce, ☞298(1), in 22A Missouri Digest under Parent and Child, ☞2(3.1), and in 15A Missouri Digest under Infants, ☞19.2(2)], and perplexing problems of custody must be settled not by applying academic rules or by mouthing pious platitudes but rather by determining, insofar as is humanly possible, what will best serve and promote the children's welfare. P—— D—— v. C—— S——, Mo.App., 394 S.W.2d 437, 446; C—— v. B——, Mo.App., 358 S.W.2d 454, 459.

 The mother's counsel also emphasizes the familiar principle of appellate review that the judgment nisi should not be set aside unless clearly erroneous and due regard should be given to the opportunity of the trial court to judge of the credibility of the witnesses. V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4); In re Neusche, Mo.App., 398 S.W.2d 453, 457(8). But the findings of the trial court are in no wise binding upon us [Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319; Easley v. Easley, Mo.App., 266 S.W.2d 28, 31(1), and cases there cited]; and, upon this review de novo, it becomes our duty to examine and ponder the entire record, to determine the right and justice of the matters in controversy, and to act upon that determination. Hurley v. Hurley, supra, 284 S.W.2d at 75 (8); Hawkins v. Thompson, Mo.App., 210 S.W.2d 747, 751(1); Parks v. Cook, Mo. App., 180 S.W.2d 64, 68(1). Reluctant as we are to disagree with the capable and conscientious trial judge, appellate review would become an empty formality [Prudot v. Stevens, Mo.App., 266 S.W.2d 756, 758] and we would be unworthy of the trust reposed in us, if we yielded our firm convictions simply because he, upon the same state of facts, found differently. Campbell v. Campbell, supra, 281 S.W.2d at 319; Hurley v. Hurley, supra, 284 S.W.2d at 75;

Shilkett v. Shilkett, Mo.App., 285 S.W.2d 67, 72; Graves v. Wooden, supra, 291 S.W.2d at 670(9). Being unable to escape the conclusion that the record does not afford reasonable support for the finding, implicit in the judgment under review, that the best interests of the children would be served by awarding full custody to the mother and, as an inescapable incident thereto, placing them under the influence, guidance and supervision of the stepfather also, the result reached by the trial court does not comport with our conscience and we are constrained to set aside that judgment. Dodds v. Dodds, Mo.App., 353 S.W.2d 810, 814.

In these circumstances, we are authorized and directed to make final disposition of the case "[u]nless justice requires otherwise." V.A.M.R. Rule 83.13(c); V.A.M.S. § 512.-160(3). However, any final disposition at this time necessarily would be predicated upon a record sixteen months old, reflecting testimony taken at a hearing less than four months after the father's marriage to the stepmother and less than seven months after the mother's marriage to the stepfather. That record indubitably reflects immaturity and instability on the part of both parents and their present spouses and unquestionably demonstrates that the trial judge was not offered a clear choice between black and white but rather was called upon to select the lighter shade of gray. C—— v. B——, supra, 358 S.W.2d at 459; E—— v. G——, Mo.App., 317 S.W.2d 462, 468. In view of the shifts in residence and employment during the period covered by the record, certainly we could not act now with any degree of confidence and assurance that other substantial and material changes of condition have not occurred since the hearing on December 2, 1965. At best, any final disposition we might now direct would verge on speculation and experimentation, which we are adjured to shun. Irvin v. Irvin, Mo.App., 357 S.W.2d 254, 256; S—— v. G——, supra, 298 S.W.2d at 77(15); Davis v. Davis, Mo.App., 254 S.W.2d 270, 275; Irvine v. Aust, Mo.App., 193 S.W.2d 336, 342.

With an eye single to the best interests of the children, we conclude that justice requires that the judgment of modification entered on December 10, 1965, be set aside and for naught held; that the cause be remanded to the circuit court for the taking of additional testimony covering the period subsequent to the hearing of December 2, 1965, and pertaining to conditions presently existing [cf. H—— v. D——, Mo.App., 373 S.W.2d 646, 655]; that, upon the evidence heretofore and hereafter adduced, the circuit court shall enter such modified custodial judgment as will serve and promote the best interests of the children, subject only to our direction that *frequent* shifts in custody shall be eliminated; and that the costs upon this appeal should be taxed against, and paid by, plaintiff-respondent and defendant-appellant, share and share alike. It is so ordered.

HOGAN and TITUS, JJ., concur.